IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAKE'S FIREWORKS INC.,

    Plaintiff,

v.

UNITED STATES CONSUMER PRODUCT
SAFETY COMMISSION, *et al.*,[1]

    Defendants.

Civil Action No. 8:19-cv-1161-PWG

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

---

[1] On October 1, 2019, Ann Marie Buerkle was replaced by Robert S. Adler as Acting Chairman of the U.S. Consumer Product Safety Commission (CPSC).

Plaintiff's sole grievance is that CPSC staff has issued routine warning letters (LOAs) to Plaintiff explaining that Plaintiff's best-selling aerial shells do not comply with the audible effects regulation, 16 C.F.R. § 1500.17(a)(3). The two LOAs provided laboratory results, *requested* voluntary compliance, and enclosed procedures explaining how to dispute the results. Although CPSC has not brought an enforcement action regarding staff's findings, Plaintiff preemptively filed this lawsuit to challenge the applicability of the audible effects regulation to its aerial shells, along with the ear test used to implement it.

Plaintiff claims that the LOAs are challengeable final agency action under the Administrative Procedure Act (APA), but neither marked the end of the agency's decisionmaking nor determined rights, obligations, or legal consequences. First, the LOAs marked only an intermediate step in the decisionmaking process *before* CPSC reached a decision to enforce. On two separate occasions, CPSC staff retested Plaintiff's aerial shells and subsequently issued the LOAs. Afterward, the parties continued having meetings and discussions regarding staff's findings. Second, the LOAs, which only *requested* voluntary compliance, did not determine rights or obligations and had no direct and appreciable legal consequences under the Federal Hazardous Substances Act (FHSA) or Consumer Product Safety Act (CPSA). Given the LOAs' lack of finality, it is only in the context of an enforcement action—after CPSC complies with certain regulatory and administrative procedures—that CPSC's actions would be sufficiently final for judicial review. No such action has been brought.

Although not necessary, this Court could also dismiss Plaintiff's claims for lack of ripeness. Without final agency action, Plaintiff's claims are not fit, and therefore not ripe, for review. Plaintiff also cannot show that it would suffer severe hardship if the Court withheld review because the LOAs have no legally binding effect. Finally, CPSC has a strong

1

institutional interest in having this Court withhold review: if CPSC were subject to suit each time it issued an LOA, the agency would be discouraged from working cooperatively with regulated entities to seek voluntary compliance.

Apart from the jurisdictional deficiency, Plaintiff has no answer to Defendants' additional observations that: (1) without enforcement, no Fifth Amendment due process considerations have attached; and (2) the conditional releases have expired and Plaintiff's aerial shells have not been found to violate the cautionary labeling regulation since May 2015. ECF 22, at 23-25 ("Opp."). Thus, even if there were final agency action and Plaintiff's claims were ripe, Plaintiff has not stated a viable Fifth Amendment Due Process Claim and two of its requests for injunctive relief are now moot.

## I. There Has Been No Final Agency Action Under The APA.

In its Opposition brief, Plaintiff continues to argue that CPSC's May 2015 LOA is a final agency action. Opp. at 2. Plaintiff also purports to identify a new final agency action: a March 2016 LOA, which summarizes CPSC staff's findings after a second retest of Plaintiff's 2014 aerial shells.[2] *Id.* at n.1. Not surprisingly, Plaintiff no longer claims that the expired conditional releases are final agency action, arguing instead that their expiration "misses the point" because CPSC staff subsequently issued the LOAs. *Id.* at 21 n.13. However, both LOAs fail to satisfy the two-prong *Bennett* test for final agency action—they neither mark the consummation of the agency's decisionmaking process nor determine rights, obligations, or legal consequences. Plaintiff's Opposition brief cannot overcome these shortcomings.

---

[2] Plaintiff does not allege in its Amended Complaint that the March 2016 LOA constitutes final agency action. *See generally* ECF 16. "'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *McDonald v. LG Electronics USA, Inc.*, 219 F. Supp. 3d 533, 541 (D. Md. 2016) (internal citation omitted).

### A. CPSC's Actions Did Not Mark The Consummation Of The Agency's Decisionmaking Process.

Plaintiff asserts that the May 2015 and March 2016 LOAs marked the consummation of the agency's decisionmaking process because they both: (1) reflected the end of an informal adjudication process; (2) definitively stated CPSC staff's determination of noncompliance; (3) did not invite further discussion, evidence, or negotiations, and did not provide information about how to appeal; and (4) were treated by CPSC as final. Opp. at 7-11. As discussed below, many of these arguments are inaccurate and none of them is determinative of finality.

*First*, Plaintiff contends that the LOAs marked the end of an informal adjudication process regarding the admissibility of imports. Opp. at 7-8; 15 U.S.C. § 1273(a) (describing admissibility process for hazardous substances "which are being imported or offered for import into the United States"); 16 C.F.R. § 1500.268(a) (describing admissibility process for hazardous substances that "may be subject to refusal of admission"). However, the LOAs were issued to Plaintiff *after* its aerial shells had been imported into the United States and the conditional releases had expired; thus, the admissibility process is inapplicable. ECF 17-1, at 8, 17-18 ("Mot.").

As Plaintiff acknowledges, 15 U.S.C. § 1270 requires CPSC staff to provide regulated entities with the results of its analysis of samples, as it did here. Opp. at 7. Apart from 15 U.S.C. § 1270, there are no other statutory provisions that govern LOAs. However, CPSC's Regulated Products Handbook (Handbook) further describes the LOA administrative process, which allows regulated entities to disagree with staff's findings by presenting evidence and requesting a hearing. *See* Mot. Ex. 4, at 5-6, 18-19. This process was ongoing as to Plaintiff's aerial shells and might never have resulted in further action by the agency.

3

Plaintiff contends that it "pursued every opportunity to respond to CPSC's allegations" and that the next step was either compliance or enforcement. Opp. at 10, 15-16. Not so. Although Plaintiff responded to the LOAs, contesting the applicability of the regulation to its aerial shells and the ear test used to implement it, *see, e.g.*, Opp. at 8, ECF 16-5, Plaintiff was also free to submit evidence of compliance with the regulation and request an informal hearing. Mot. Ex. 4, at 5-6, 18-19. During the several discussions and meetings following the May 2015 LOA, *see* ECF 16, at ¶ 10, Plaintiff also had the ability to convince the agency to change its position, use an alternative testing method, or enter into an alternative resolution. *See Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 732 (D.C. Cir. 2003) ("So long as Reliable retains the opportunity to convince the agency that it lacks jurisdiction over Reliable's sprinkler heads, it makes no sense for the court to intervene").[3] Plaintiff's reliance on *Sackett v. EPA*, 566 U.S. 120 (2012), is misplaced. In *Sackett*, unlike here, the petitioners' request for an informal hearing was denied (here, no request was even made) and the findings in the compliance order were immediately enforceable and not subject to further EPA review. *Id.* at 127.

The LOA administrative process concludes when the parties reach a resolution or CPSC decides to bring an enforcement action. *See* Mot. Ex. 4, at 19 (noting that staff "*may* request the [Office of General Counsel (OGC)] approve appropriate legal proceedings"); Mot. Ex. 4, at 18

---

[3] Plaintiff spends several pages of its Opposition brief attempting to distinguish *Reliable*, arguing that *Reliable* involved a different statutory scheme under the CPSA for substantial product hazards. Opp. at 16-19. This distinction is immaterial. Courts continue to cite *Reliable* for the proposition that agency advice letters with no legally binding effect are not final agency action. *See, e.g.*, *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (citing *Reliable*); *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 428-29 (D.C. Cir. 2004) (same); *Ipsen Biopharms. Inc. v. Hargan*, 334 F. Supp. 3d 274, 278-79 (D.D.C. 2018) (same). *Reliable* applies with equal force here. As in *Reliable*, "the agency has not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences." *Reliable*, 324 F.3d at 732.

("Commission staff, as a general rule, will notify you in writing before staff pursues any enforcement action against the products or your firm"). Until then, the LOAs remain only an intermediate step before final agency action. *See Georator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979) (holding that EEOC determination "merely preparatory to further proceedings"). To date, CPSC has never initiated an enforcement action against Plaintiff nor did it threaten to do so in the LOAs.

Nor is this case similar to *Doe v. Tenenbaum*, 127 F. Supp. 3d 426 (D. Md. 2012), Opp. at 10-11, which involved an adjudication process markedly different from the LOA process at issue here. In *Tenenbaum*, the statutory and regulatory scheme applicable to specific incident reports mandated publication of the report after CPSC "resolve[d] disputed facts, weigh[ed] evidence, and ma[d]e a legal 'determination' that the report was free of materially inaccurate information and otherwise publishable." *Id.* at 464. The publication of the report was the "last step in the decision-making process that the CPSIA and its implementing regulations set in motion." *Id.* at 465. Here, by contrast, although CPSC is required to provide regulated entities with the results of its examination of samples, *see* 15 U.S.C. § 1270(c), there is no similar statutory or regulatory scheme setting forth an informal adjudication process for LOAs or mandating the issuance of an LOA at the end of such process. *See Tenenbaum*, 127 F. Supp. 3d at 464 (distinguishing *Golden and Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010), on the basis that it did "not involve informal adjudication incident to a statutory and regulatory scheme").

*Second*, Plaintiff asserts that the LOAs marked the end of the decisionmaking process because they included definitive language of noncompliance. Opp. at 8-9. But as Plaintiff concedes, definitive language of noncompliance is not dispositive of final agency action. Opp. at

3 (acknowledging that some earlier notices with definitive language "were arguably not final agency actions"); *see, e.g.*, *Holistic*, 664 F.3d at 941-42 (holding FDA warning letter not final despite including definitive language of noncompliance); *Georator*, 592 F.2d at 767 (holding that EEOC determination not final despite declaratory language); *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 3-6 (D.D.C. 1989) (withholding judicial review on finality and ripeness grounds despite that warning letter stated agency position on noncompliance). In support of its position, Plaintiff relies on *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42 (D.C. Cir. 2016), *see* Opp. at 8-9, but in that case, the D.C. Circuit found that any possibility for reconsideration was mere boilerplate. 836 F.3d at 56. Here, by contrast, the Handbook specifically provides a process for disputing an LOA. *See* Mot. Ex. 4, at 18. Further, despite providing retest results and explaining that certain retested aerial shells continued to exhibit noncompliance, the LOAs only *requested* that Plaintiff initiate corrective action by not selling its aerial shells and destroying them, and described sanctions to which Plaintiff "*could*" be subject. *See* Mot. Ex. 9, at 3. They also lacked any language whatsoever threatening initiation of an enforcement action. *See id.*

*Third*, Plaintiff maintains that the LOAs marked the end of the decisionmaking process because they "did not invite further discussions, did not explain options for challenging their conclusions, and did not suggest that CPSC was still considering what it would do about the alleged violations." Opp. at 9. Once again, this argument ignores the process set forth in the Handbook, which permits regulated entities to dispute LOAs. Mot. Ex. 4, at 18; *see also Holistic*, 664 F.3d at 944 (finding no final agency action where company could respond to warning letter and FDA would evaluate response to determine whether product could be legally marketed). That the LOAs did not include a specific reference to the chapter on the dispute

6

process is irrelevant—the entire Handbook was enclosed with each LOA.  *See* Opp. at 3-4; Mot. Exs. 1 & 9, at 4.

*Fourth*, Plaintiff asserts that CPSC treated the LOAs as final, but Plaintiff is incorrect. Opp. at 11.  According to the Handbook, LOAs are: (1) a mechanism for obtaining voluntary compliance *before* initiating litigation; (2) contingent on future agency action; and (3) subject to further review.  Mot. Ex. 4, at 7 (noting goal of obtaining corrective action "primarily by working cooperatively with industry, but initiating litigation when necessary"); *Id.* at 5 (discussing purpose of LOA to inform entities of legal actions available to Commission); *Id.* at 11-17 (describing sanctions that "may be imposed" against entity); *Id.* at 18 (noting that staff will typically inform entity in writing before pursuing enforcement action); *Id.* at 18-19 (describing dispute process available to entities who receive LOAs).  CPSC staff's treatment of the LOAs here was consistent with the Handbook's description of the LOA process and purpose.  Indeed, on two separate occasions, CPSC staff reconsidered its findings regarding the aerial shells that were the subject of the LOAs, *see generally* Mot. Exs. 1 & 9, and the parties continued having "discussions and meetings" after they were issued.  *See* ECF 16, at ¶ 10.  Further, while the March 2016 LOA described potential sanctions to which Plaintiff *could* be subject, it did not state that sanctions were inevitable or that CPSC intended to pursue sanctions.  *See* Mot. Ex. 9, at 3.  This case thus differs from *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181 (D.C. Cir. 2007), where, unlike here, there was no indication that the agency's positions were "tentative, open to further consideration, or conditional on future agency action." *Id*. at 1187-88.

### B. CPSC's Actions Did Not Determine Rights Or Obligations.

Plaintiff contends that the LOAs determined rights or obligations because they "directed," "ordered," and "mandated" Plaintiff not to sell its products and destroy them, *see*

7

Opp. at 11-13, 20, but these assertions are unsupported by the text of the LOAs. As the text makes clear, the LOAs only *requested* such corrective actions. Mot. Ex. 1, at 2-3 ("staff reiterates its request that the distribution … not take place and that the existing inventory be destroyed"); Mot. Ex. 9, at 2 ("staff thus reiterates its original request for corrective action of the sampled lots"). Given the potential hazards involved in destroying fireworks, the LOAs sought specific actions to be undertaken if Plaintiff chose to destroy them, but the decision to destroy was completely voluntary. Mot. Exs. 1 & 9, at 3; *see Reliable*, 324 F.3d at 732 ("But the request for voluntary compliance clearly has no legally binding effect."). In short, as a request for voluntary compliance, the LOAs did not compel Plaintiff or CPSC to do anything. *Cf. Sackett*, 566 U.S. at 125 (holding compliance order final where it directed petitioners to "immediately" take action pursuant to an EPA work plan and provide EPA with immediate site access); *see also Valero Energy Corp. v. EPA*, 927 F.3d 532, 538 (D.C. Cir. 2019) (finding no final agency action where EPA document set forth legal position "without imposing any new obligations, prohibitions, or requirements"); *Holistic*, 664 F.3d at 944 (finding FDA warning letter not final where it only *requested* that companies "cease marketing, promoting, and distributing ear candles" and did not compel action); *Indep. Equip. Dealers*, 372 F.3d at 427 (finding no final agency action where letter did not compel action); *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1028 (D.C. Cir. 2016) (finding that agency advice letter "created no new legal obligations beyond those the FLSA already imposed").[4]

---

[4] Plaintiff makes much of the fact that CPSC's Directorate for the Office of Compliance and Field Operations has been delegated certain authority, arguing that under the FHSA, staff decisions in LOAs "establish a manufacturer's legal rights and obligations with no further action required by the full Commission." Opp. at 5. But neither the Directorate of the Office of Compliance and Field Operations nor its staff can bring enforcement actions on their own. Any enforcement recommendations must be approved by OGC, who then refers the matter to the U.S. Department of Justice. 15 U.S.C. § 2076(b)(7)(A); 16 C.F.R. § 1000.14. Here, the LOAs were

### C. CPSC's Actions Had No Direct And Appreciable Legal Consequences.

Considering the specific statutes and regulations at issue here, Plaintiff's Opposition brief fails to show that the LOAs have direct and appreciable legal consequences. *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019) (noting that second *Bennett* factor requires courts to consider the "concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it"). Plaintiff maintains that the LOAs have serious legal consequences because if Plaintiff ignored the LOAs and sold its products, it would "face exposure to substantial civil and criminal penalties under the FHSA." Opp. at 20. Plaintiff further contends that it would be subject to *enhanced* civil and criminal penalties because CPSC could rely on the LOAs to argue that Plaintiff's distribution of the aerial shells was "willful or knowing." *Id.* at 20-21. These assertions are flawed for several reasons.

*First*, Plaintiff's exposure to civil and criminal penalties under the FHSA or CPSA does not depend on whether it sells its products. Indeed, CPSC could bring an enforcement action seeking civil or criminal penalties against Plaintiff simply because it imported its aerial shells. 15 U.S.C. § 2069(a)(1) (authorizing civil penalties for knowing violations of 15 U.S.C. § 2068(a)(1) by importing products not in conformity with a consumer product safety rule or any similar rule, regulation, standard, or ban under any other Act enforced by the Commission, including the FHSA); 15 U.S.C. § 1264 (permitting civil and criminal penalties for violations of 15 U.S.C. § 1263(a) for introducing or delivering for introduction into interstate commerce any banned hazardous substance); *see United States v. Shelton Wholesale, Inc.*, No. 96-6131, 1998 WL 251273, at *5 (W.D. Mo. April 28, 1998) (noting that potential liability existed under FHSA

---

issued by Compliance staff, and there was no indication that either staff member had authority to bring an enforcement action. *See* Mot. Ex. 4, at 19 (noting that staff must request approval for enforcement proceedings). Nor has any enforcement action been brought.

as soon as products left Hong Kong).  In short, Plaintiff's decision to voluntarily comply by ceasing distribution does not shield it from liability under the CPSA or FHSA.  *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15 (D.C. Cir. 2005) (noting that compliance with agency protocols did not provide a "safe harbor" from prosecution).

*Second*, Plaintiff's receipt of the LOAs does not by itself render Plaintiff's conduct "knowing" for purposes of enhanced civil and criminal penalties under the FHSA or CPSA.[5] Knowledge is *not* required for misdemeanor criminal penalties under the FHSA, therefore notice of a violation is irrelevant.  15 U.S.C. § 1264(a) (authorizing misdemeanor liability without *mens rea* requirement); *see United States v. Luv N' Care Int'l*, 897 F. Supp. 941, 945 (W.D. La. 1995) (discussing lack of *mens rea* requirement for misdemeanor liability under FHSA).  As for more severe criminal penalties, the FHSA requires "intent to defraud or mislead" or "second or subsequent offenses" and the CPSA requires a "knowing and willful violation," neither of which are legally imputed by the issuance of the LOAs to Plaintiff.  15 U.S.C. §§ 1264(a), 2070(a)(1), (b).

As for civil penalties, the knowledge requirement applies to Plaintiff's knowledge of its actions, not to its knowledge of the law, and such knowledge is imputed when a person fails to act reasonably in the circumstances.  15 U.S.C. §§ 1264(c)(1), 2069(a)(1); *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 563-65 (1971) (requiring knowledge of actions, not the law); *United States v. Shelton*, 34 F. Supp. 2d 1147, 1161 (W.D. Mo. 1999) (holding that

---

[5] Before a civil or criminal penalty is sought, the regulated entity must be notified and provided an opportunity to present views or submit evidence and arguments. 15 U.S.C. § 1266; 16 C.F.R. § 1119.5.  Additionally, the Commission must approve any OGC settlement of a civil penalty or OGC recommendation to refer to the U.S. Department of Justice an action seeking to assess a civil penalty. 15 U.S.C. § 2069(b), (c).  None of these steps have been taken with regard to Plaintiff's aerial shells.

knowledge imputed when person fails to act reasonably in the circumstances). However, nothing in the FHSA or CPSA imputes knowledge to regulated entities for having received an LOA. Practically speaking, CPSC *could* argue in an enforcement proceeding that Plaintiff acted knowingly because a reasonable person would not have ignored multiple warnings from the agency, but courts consider many factors in determining knowledge. *See Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 811 (D.C. Cir. 2006) (finding no final agency action where agency's guidelines had only practical, not legal, consequences); *see also Shelton*, 34 F. Supp. 2d at 1164 (considering many factors in determining whether company acted knowingly).[6]

Plaintiff cites *Rhea Lana* for the proposition that CPSC could rely on the LOAs to show that Plaintiff acted knowingly to support enhanced civil and criminal penalties. Opp. at 21. However, the statutory scheme in *Rhea Lana* was notably different. In *Rhea Lana*, unlike the FHSA, the Fair Labor Standards Act (FLSA) specifically imputed willfulness to employers who received notice of a violation. 824 F.3d at 1029. As such, the D.C. Circuit held that the agency's letter was more than "mere agency advice" because eligibility for willfulness penalties under the FLSA flowed directly from the letter itself. *Id.* at 1025. Indeed, the letter informed the plaintiff that receipt of the letter exposed it to willfulness penalties that would otherwise not apply. *Id.* at 1029-30. Contrary to *Rhea Lana*, there is no similar provision in the FHSA or

---

[6] Citing to 15 U.S.C. § 1264(c)(2)(B), Plaintiff suggests in a parenthetical that it would be exempt from the provision allowing multiple penalties for a series of violations if it had not been issued an LOA. Opp. at 20. But Plaintiff misinterprets the statute. Section 1264(c)(2)(B) provides an exception to the multiple penalty provision for entities, such as retailers, who did not have actual knowledge or notice from the Commission of the violation. However, as an importer and distributor, *see* ECF 16, at ¶ 5, Plaintiff is not eligible for this exception. 15 U.S.C. § 1264(c)(2)(A).

CPSA specifying that an "unheeded agency warning" itself imputes knowledge. As such, the LOAs are not a stand-alone trigger for civil or criminal penalties under either statute.

Plaintiff also cites *Sackett* in support of its argument that the LOAs had legal consequences, but *Sackett* is inapplicable for several reasons. There, the agency action at issue was a binding compliance order—an enforcement mechanism available to the EPA under the Clean Water Act. *Sackett*, 566 U.S. at 123. The Supreme Court held that the compliance order had direct and appreciable legal consequences because the order itself exposed plaintiff to double penalties in future enforcement proceedings. *Id.* at 126. Here, unlike *Sackett*, an LOA is not a statutorily prescribed enforcement tool, nor does it automatically expose regulated entities to increased penalties for having received it.[7]

Finally, relying on *U.S. Army Corps of Eng'rs v. Hawkes*, 136 S. Ct. 1807 (2016), Plaintiff contends that the LOAs had direct and appreciable legal consequences because they deprived Plaintiff of a safe harbor it would have had if CPSC staff concluded that its aerial shells were compliant. Opp. at 21. Plaintiff is wrong. In *Hawkes*, the Supreme Court held that an approved jurisdictional determination (JD) had direct and appreciable legal consequences because it deprived the respondents of a five year safe harbor from enforcement under the Clean Water Act. *Hawkes*, 136 S. Ct. at 1814. If the respondents had been issued a negative JD, *i.e.* finding that the property did not contain jurisdictional waters, the agency and the government would be bound by that finding for 5 years, during which time no enforcement proceeding could be brought. *Id.* Unlike *Hawkes*, the LOAs did not deprive Plaintiff of any safe harbor. No

---

[7] By contrast, under the FHSA and CPSA, the Commission may issue an order, following a trial-type hearing, directing a regulated entity to undertake corrective action. *See, e.g.*, 15 U.S.C. §§ 1274(b); 2064(c). Although failure to comply with such order is prohibited, none was issued here. *Id.* at §§ 1263(j); 2068(a)(5).

12

statute, regulation, or agreement binds CPSC or the government to CPSC staff's test results. If CPSC staff had instead found Plaintiff's aerial shells in compliance, it would not prevent staff from later changing its position if it subsequently had reason to believe Plaintiff's aerial shells were noncompliant, nor would it bar the government from bringing an enforcement action.

In short, the LOAs are "all bark and no bite." *Cal. Cmtys.*, 934 F.3d at 637 (holding legal consequences did not flow from agency memo). While they forecast CPSC staff's position on Plaintiff's aerial shells and seek voluntary compliance, the LOAs have "no independent legal authority" and no direct and appreciable legal consequences flow from them under the FHSA or CPSA. *Id.* Here, the only consequence of the LOAs is Plaintiff's voluntary compliance, but "*de facto* compliance is not enough to establish that the [LOAs] have had *legal* consequences." *Ctr. For Auto Safety*, 452 F.3d at 811.[8]

## II. Plaintiff's Claims Are Not Ripe.

Plaintiff contends that its claims satisfy the fitness prong of the ripeness inquiry because: (1) the LOAs are final agency action; and (2) the issue of whether an agency action is arbitrary and capricious is purely legal. Opp. at 22. As discussed *supra*, the LOAs do not constitute final agency action, therefore Plaintiff's claims are not fit, and therefore not ripe, for review. *Holistic*, 664 F.3d at 943 n.4. Further, the issue of whether CPSC's ear test is arbitrary and capricious is an inherently fact-based inquiry. *See Reliable*, 324 F.3d at 734 (finding question of whether

---

[8] Plaintiff incorrectly asserts that the LOAs have legal consequences because they may be considered by the Commission in deciding whether to increase a civil penalty. Opp. at 20. But the Civil Penalty Factors do not include a factor for simply having received an LOA. *See* 16 C.F.R. § 1119.4. Plaintiff points to the factor allowing consideration of whether a person failed to respond in a timely fashion to requests for remedial action, *see* 16 C.F.R. § 1119.4(b)(4), but this factor is "intended to address a person's dilatory and egregious conduct in responding to written requests for information or remedial action sought by the Commission." *Id.* Thus, any legal consequence of this factor results from the conduct of the regulated entity, not an LOA.

statutory term included sprinkler heads not purely legal because it "would clearly involve the resolution of factual issues and the creation of a record"). A fact finder would have to "engage in an extensive fact-based determination" regarding whether Plaintiff's aerial shells were intended to produce audible effects. *Estee Lauder*, 727 F. Supp. at 4 (holding issue of whether skin creams were making improper drug claims not purely legal).

Plaintiff further argues that it would suffer severe hardship if review was delayed, *see* Opp. at 23, but as discussed *supra*, any hardship Plaintiff suffers is self-imposed, as the LOAs only *requested* that Plaintiff not sell its aerial shells and had no legally binding effect. Plaintiff risked civil and criminal penalties as soon as it imported noncompliant aerial shells. *See* 15 U.S.C. §§ 1263(a), 1264. Nevertheless, CPSC has not brought an enforcement action nor has it threatened to do so. As such, Plaintiff's "claimed hardship is no greater than any company confronted by an interpretation of a law it dislikes." *Estee Lauder*, 727 F. Supp. at 5.

Contrary to Plaintiff's assertion, CPSC has a "strong institutional interest in having this Court withhold its review." *Id.* CPSC issues approximately 1,600 LOAs each year. Mot. at 16. If CPSC "were subject to suit each time it warned a company that its products violated the [FHSA], [the agency] would be inhibited from performing a valuable public service—the issuing of" LOAs to obtain voluntary compliance *before* initiating litigation. *Estee Lauder*, 727 F. Supp. at 5-6.

### III. Plaintiff Fails To State A Cognizable Fifth Amendment Claim And Seeks Injunctive Relief That Is Moot.

Not only has Plaintiff failed to establish subject matter jurisdiction, but its Opposition brief also fails to overcome two additional deficiencies raised in Defendants' Motion to Dismiss: (1) no Fifth Amendment due process considerations attach to the LOAs; and (2) Plaintiff seeks injunctive relief for conduct that no longer exists. *See* Mot. at 22-25.

14

Relying on *United States v. Chrysler*, 158 F.3d 1350 (D.C. Cir. 1998), and not the seminal case on the void-for-vagueness doctrine as it did in its Amended Complaint, *see* ECF 16, ¶ 104, Plaintiff contends that CPCS's ear test deprived Plaintiff of its property without due process of law. Opp. at 24. But Plaintiff's reliance on *Chrysler* is misplaced. There, the National Highway Safety Administration brought a lawsuit seeking a recall of the company's products, which the district court ordered. *See Chrysler*, 158 F.3d at 1354 (noting that "[d]ue process requires that parties receive fair notice before being deprived of property") (internal quotation marks and citation omitted). Here, because no enforcement proceeding has been brought, there has been no property deprivation that would trigger due process considerations. Consequently, Plaintiff's Fourth Cause of Action should be dismissed. *See Georator*, 592 F.2d at 768 (stating that "[w]hen only investigative powers of an agency are utilized, due process considerations do not attach"); *Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*, 884 F.3d 1205, 1215 (D.C. Cir. 2018) (noting failure to show "that the mere issuance of a warning letter, absent further enforcement action, effects any such deprivation").

Plaintiff's Opposition brief also fails to address Defendants' arguments regarding two of its requests for injunctive relief: (1) that Plaintiff's aerial shells are no longer subject to a conditional release, and are therefore not currently "detained" as alleged in the Amended Complaint; and (2) that CPSC has not found a cautionary labeling violation regarding Plaintiff's aerial shells since May 2015. Opp. at 25; Mot. at 23-35. Accordingly, these requests for injunctive relief are moot and should be dismissed.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in the Motion, this Court should grant Defendants' Motion to Dismiss Plaintiff's Amended Complaint.

| Of counsel: | Respectfully submitted, |
|---|---|
| J. GIBSON MULLAN<br>Acting General Counsel | JOSEPH H. HUNT<br>Assistant Attorney General<br>Civil Division |
| MELISSA V. HAMPSHIRE<br>Assistant General Counsel | DAVID MORRELL<br>Deputy Assistant Attorney General |
| AMY S. COLVIN<br>ALEXANDER W. DENNIS<br>Attorneys<br>U.S. Consumer Product Safety Commission<br>Bethesda, MD 20814 | GUSTAV W. EYLER<br>Director<br><br>ANDREW E. CLARK<br>Assistant Director |
| Dated: November 12, 2019 | */s/ Hilary K. Perkins*<br>HILARY K. PERKINS<br>Trial Attorney<br>Consumer Protection Branch<br>U.S. Department of Justice<br>450 Fifth St., N.W., Suite 6400 South<br>Washington, DC 20530<br>Telephone: (202) 307-0052<br>Facsimile: (202) 514-8742<br>Hilary.K.Perkins@usdoj.gov<br><br>*Counsel for Defendants* |

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 12th day of November, 2019, I electronically filed a copy of the foregoing document with the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Hilary K. Perkins*
HILARY K. PERKINS
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
450 Fifth St., N.W., Suite 6400 South
Washington, DC 20530
Telephone: (202) 307-0052
Fax: (202) 514-8742
Hilary.K.Perkins@usdoj.gov